CAMERON SEPTIC TANK CO. v. VILLAGE OF SARATOGA SPRINGS et al.

(Circuit Court, N. D. New York.   March 12, 1907.)

1. PATENTS—PROCESS—PATENTABILITY.
    It is when the term "process" is used to represent the means or method of producing a result that it is patentable, and it will include all methods or means, not natures, which are not effected by mechanism or mechanical combinations.
    [Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, § 6.]

2. SAME.
    A principle is not patentable, and while there may be a valid patent for means or methods of putting principles into operation so as to produce useful results, there cannot be for nature's means and methods.
    [Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, § 5.]

3. SAME—INVENTION—PROCESS AND APPARATUS FOR TREATING SEWAGE.
    The Cameron, Commin, and Martin patent, No. 634,423, for a process of and apparatus for treating sewage, is void for lack of invention, in view of the prior art.  The process claims for liquefying sewage by anaërobic action are for an aggregation of three separate and successive processes, two of which were old, and the other a process of nature not patentable, and which had, moreover, been previously discovered and utilized by others.  The apparatus claims, which cover a settling tank, a septic tank, and an aërator, disclose nothing which was not known and used in the prior art, except, perhaps, an improvement in the outlet of the septic tank, which involved no invention.  Also *held* not infringed, even if valid, as limited by the prior art.

In Equity.   Suit to restrain alleged infringement by defendants of certain claims of United States letters patent No. 634,423, granted to Donald Cameron and others October 3, 1899, for "Process of and apparatus for treating sewage," and for an accounting.

Gifford & Bull (Livingston Gifford, of counsel), for complainant.
John J. Healey, Jr. (Ephraim Banning, Charles L. Sturtevant, and Edgar Brackett, of counsel), for defendants.

RAY, District Judge.   The patent in suit, applied for March 15, 1897, and issued October 3, 1899, to Donald Cameron, Frederick J. Commin, and Arthur J. Martin, of Exeter, England, is for a process and apparatus for treating sewage.   It declares that the patentees "have invented certain new and useful improvements in processes of and apparatus for liquefying and purifying sewage," for which they have received letters patent in England, No. 21,142, dated November 8, 1895, and in other foreign countries, giving dates and numbers. It then declares that:

"The following is a full, clear, and exact description of the invention which will enable others skilled in the art to which it appertains to make and use the same."

It also declares that the object of the invention is to provide an artificial method and apparatus for the liquefaction and purification of sewage on a practical and efficient scale in a natural and simple manner, avoiding the formation of sludge.   It also declares that the invention consists (1) in certain methods of developing, in a flowing current of sewage, bacteria capable of dissolving the mass of solid organic matter

contained in the sewage; (2) of subsequently utilizing the so-developed bacteria in liquefying the mass of organic matter contained in the flowing current of sewage; and (3) of further purifying the effluent liquid. The patent then declares that the invention also consists in the apparatus for carrying out the process. It further declares that:

"The process of purification comprises the subjection of the sewage to the dissolving action of anaërobic bacteria and subsequently to exposure to air and light."

The patent then describes the process, as follows:

"In carrying out the process the first step is to develop in a flowing current of sewage micro-organisms or bacteria of a character and quantity capable of practically liquefying the mass of solid organic matter contained in the flowing current of sewage. This is effected by forming a pool in the flowing current and secluding said pool from light, air, and agitation, while permitting a nondisturbing inflow of the sewage into the pool and an outflow therefrom. In this condition of the pool, in the absence of light, air, and agitation, the micro-organisms increase at a fabulous rate, being fed by the incoming solid matter of the sewage until a mass of bacteria is developed sufficient in character and quantity to liquefy substantially all the solid organic matter contained in the sewage passing through the pool. During this operation there is formed on the surface of the sewage in the pool a brown scum. This crust of solid substances floating and completely bridging over the water is from two to three inches thick, and although there is a continued inflow of raw sewage, and a continued outflow of the liquid effluent, this scum remains at about the same thickness, and does not increase. This scum attains its thickness of from two to three inches in about a week after the tank is put into use, and, although no part of it is removed, it continues at the same thickness. After the formation of this practical solid-dissolving mass of bacteria, the nondisturbing inflow and outflow are continued until practically all the solid organic matter is dissolved, and the outflow is in the form of a liquid without solid particles of sewage. The operation goes on, and the flowing current of sewage is continually liquefied. The liquefied sewage as it leaves the septic pool has a slight odor, so slight, however, that it cannot be noticed at a distance of a yard or two, and to relieve it of this slight odor it is subjected to an aërating operation."

The patent then states that in some systems now employed, where purification is sought, the crude sewage is first treated chemically, so that the solids are to a great extent precipitated, and that it is only the liquid which is treated by filtration or otherwise; that in such processes the solid matter rapidly accumulates in the form of an offensive sludge which is difficult to dispose of. The patent then declares that, by the process described therein, such treatment may be entirely dispensed with, and the expense of dealing with the precipitated matter obviated. The patent also states that, in the prior systems, it has been considered of advantage that there should be contact of the sewage matter with the air; but that in the invention of the patent, and in treating sewage under its process, it is of the utmost importance that means be provided for preventing contact with the air, and that the chamber in which the bacteriological action takes place should be dark in order to assist the bacteria contained in the sewage to rapidly multiply, it being a well-known fact that bacteria multiply rapidly in dark places. The patent says that the exclusion of light and air can be secured by a closed cover to the tank or vessel containing the sewage, which cover may be removed after several days, as, after such

closed tank has been in operation two or three days, the brown scum begins to form at the top of the mass of sewage, and eventually becomes two or three inches thick, and serves as an air-tight cover to the sewage underneath. The patent also states that this scum is formed by bacteriological action, and rises in particles from the bottom of the tank; gas forming in and carrying the particles to the top of the mass. The patent also states that, after the tank has been in operation sufficiently long for this scum to commence forming, the effluent is so free from matter in suspension that it (the effluent) is in a condition to be further treated by any other means, such, for example, as coke-breeze filters, or for irrigation or for discharging into rivers or tidal waters.

Says the patent:

"By this invention crude sewage can be treated for long periods without practically any sludge at all forming in the tank."

The claims for this process in suit read as follows:

"(1) The process of purifying sewage which consists in subjecting the sewage under exclusion of air, of light, and of agitation to the action of anaërobic bacteria until the whole mass of solid organic matter contained therein becomes liquefied, and then subjecting the liquid effluent to air and light.

"(2) The process of liquefying the solid matter contained in sewage, which consists in secluding a pool of sewage having a nondisturbing inflow and outflow, from light, air, and agitation, until a mass of micro-organisms has been developed of a character and quantity sufficient to liquefy the solid matter of the flowing sewage, the inflow serving to sustain the micro-organisms, and then subjecting said pool under exclusion of light and air and under a nondisturbing inflow and outflow to the liquefying action of the so-cultivated micro-organisms, until the solid organic matter contained in the flowing sewage is dissolved.

"(3) The process of liquefying the solid matter contained in sewage, which consists in secluding a pool of sewage having a nondisturbing inflow and outflow, from light, air, and agitation until a mass of micro-organisms has been developed of a character and quantity sufficient to liquefy the solid matter of the flowing sewage, the inflow serving to sustain the micro-organisms, then subjecting said pool under a nondisturbing inflow and outflow and under exclusion of light and air to the liquefying action of the so-cultivated micro-organisms until the solid organic matter contained in the flowing sewage is dissolved, and then subjecting the liquid outflow to an aërating operation.

"(4) The process of liquefying the solid matter contained in sewage, which consists in secluding a pool of sewage having a nondisturbing inflow and outflow from light, air, and agitation until a mass of micro-organisms has been developed of a character and quantity sufficient to liquefy the solid matter of the flowing sewage, the inflow serving to sustain the micro-organisms, then subjecting said pool under a nondisturbing inflow and outflow and under exclusion of light and air to the liquefying action of the so-cultivated micro-organisms until the solid organic matter contained in the flowing sewage is dissolved, then subjecting the liquid outflow to an aërating operation, and then to a filtering operation."

"(21) The process of liquefying the solid matter contained in sewage, which consists in secluding a pool of sewage having a nondisturbing inflow and outflow from light, air, and agitation until a thick scum is formed on the surface thereof and a mass of micro-organisms has been developed of a character and quantity sufficient to liquefy the solid matter of the flowing sewage, the inflow serving to sustain the micro-organisms, and then subjecting said pool under the cover of said scum and under a nondisturbing inflow and outflow to the liquefying action of the so-cultivated micro-organisms until the solid matter contained in the flowing sewage is dissolved."

Claim 1 has two steps in the process: (1) Subjecting the sewage, excluded from light, air, and agitation, to the action of anaërobic bacteria until the whole mass of solid organic matter contained therein becomes liquefied; and (2) then subjecting such liquid effluent to air and light. Claim 2 (1) secludes in a pool the sewage from light, air, and agitation until the micro-organisms have been developed to a sufficient extent to liquefy the mass, and (2) then subjecting the pool of sewage to the liquefying action of such micro-organisms; light and air being excluded, and the inflow and outflow of sewage being non-disturbing. Claim 3 differs from claim 2, in that it adds the aërating operation, viz., "and then subjecting the liquid outflow to an aërating operation." Claim 4 differs from claim 3, in that it adds "a filtering operation" after the aërating operation. Claim 21 adds to claim 2 the scum, before mentioned, as a means for covering the mass of sewage, after the micro-organisms have been developed, and protecting it or secluding it from light and air.

After this scum has been formed, air and some light may be admitted into the tank, containing the mass of sewage, above the scum, as then the scum protects the sewage and the micro-organisms therefrom. The anaërobes are bred, produced, and live and rapidly multiply in the sewage when secluded from light and air and the mass is free from agitation, and they feed upon and dissolve, or liquefy, so to speak, the incoming sewage. They die if exposed to light and air, and will neither multiply nor do their work effectually if the mass is agitated. When the mass has become liquefied, or as rapidly as it becomes liquefied, it flows out of the pool and tank, at the places provided in the tank, and is then, by exposure to the air, aërated, and may then pass into a filter, where it is subjected to the action of aërobic bacteria and other treatment and further purified. It must be conceded that if this process was new, and is operative, it discloses utility, and possibly patentable invention if accompanied by suitable means. The patent assumes a practically continuously flowing current of sewage, and it is obvious that, if the process is to be made of use to mankind, means for carrying it into effect must be provided. There must be a tank or receptacle in which the "pool" of sewage, except the water and fluids, may stand or remain while the "anaërobic bacteria" or "micro-organisms" are being developed, or grown, and during this period such tank must be substantially air-tight, except as air is brought in with the sewage, and closed against light. Hence, such a tank or receptacle must be provided. This must be connected with the sewage pipes so as to permit the inflow of sewage, but in such a manner and by such means as will prevent undue agitation of the pool of sewage therefrom. So there must be means provided for the egress or outflow of the liquefied contents or sewage, and these must be so arranged as to prevent undue or serious agitation of the mass of sewage in the tank or the outflow of floating solids or the obstruction of the openings by such solids, or the breaking up of the "scum." Inside the tank proper, the essential conditions are: Absence of light, absence of oxygen, absence of agitation of the contents. But absence of air and of some degree of light in the tank above the mass of sewage is not essential after the formation of the "scum." These conditions be-

ing provided for and present in the tank, the process of liquefication is self-acting: that is, the anaërobic bacteria or micro-organisms rapidly develop in the sewage itself, and multiply and in due time liquefy the solids of the sewage which remain motionless in the bottom of the tank until liquefied by the action of the anaërobes. If agitation is avoided, the scum forms and covers the pool or mass of sewage in the tank excluding light and air, and hence the process goes on uninterruptedly, and all solids susceptible to such anaërobic action are liquefied and then pass out at the outlet of the tank. As this liquid outflow has some odor, it is wise, but not absolutely essential, to subject it to further processes of purification before permitting it to go at large. Hence means for "aërating," and, if desirable, means for the "filtering operation." But these two processes are old, independent of each other, and also independent of the liquefying process carried on in the septic tank itself. The completed purification consists therefore of three successive processes: (1) Liquefication by anaërobic action in the tank; (2) aëration in the aërator after leaving the tank; and (3) filtration after leaving the aërator. This is a mere aggregation of processes, two of which are old, while the other is a process of nature or a natural process performed by nature on a pool of sewage held in a tank under proper conditions long enough for nature to do its work.

The patent contains the following claims, in suit, for the "apparatus":

"(5) In an apparatus for the purification of sewage, the combination of a septic tank having an outlet disposed above the bottom and below the normal water-level of the tank, and open across the greater part of the width thereof, and an aërator connected with said outlet.

"(6) In an apparatus for purifying sewage, the combination of a drain or sewer, a settling-tank, connected therewith and adapted to receive the contents thereof, a septic tank connected with said settling-tank and provided with an outlet disposed above the bottom and below the normal water-level of the tank and open across the greater part of the width thereof.

"(7) In an apparatus for the purification of sewage, the combination of a septic tank, and an outlet therefor disposed above the bottom and below the normal water-level thereof; said outlet comprising a conduit having a longitudinal slot open across the greater part of the width of the tank.

"(8) In an apparatus for the purification of sewage, the combination of a septic tank having an outlet consisting of a pipe extending across the greater part of the width of the tank and disposed above the bottom and below the normal water-level thereof; said pipe having an opening in its wall throughout its length for admitting the effluent."

"(11) In an apparatus for purifying sewage, the combination of a septic tank, an inlet disposed above the bottom of the tank and below the normal water-level thereof and occupying the greater part of the width of said tank, and an outlet extending across the greater part of the width of the tank and disposed above the bottom of the tank and below the normal water-level thereof.

"(12) In an apparatus for purifying sewage, the combination of a septic tank, an inlet occupying the greater part of the width of said tank, and an outlet extending across the greater part of the width of the tank and disposed above the bottom of the tank and below the normal water-level thereof; said outlet comprising a pipe having a longitudinal slot therein extending the greater part of its length."

"(20) In an apparatus for the purification of sewage, the combination of a septic tank, means for excluding air and light, a nondisturbing inlet for said tank disposed below the normal water-level thereof and provided with a broadened mouth, a nondisturbing outlet for said tank disposed below, the normal

water-level thereof and provided with a broadened mouth, and a sewage-conduit connected with said inlet."

"(22) In an apparatus for the purification of sewage, the combination of a. septic tank, means for excluding air and light, a nondisturbing inlet for said tank disposed below the normal water-level thereof, a nondisturbing outlet for said tank disposed below the normal water-level thereof, and a sewage-conduit connected with said inlet."

## After describing the drawings, the patent says:

"Figs. 1, 2, and 3 represent a suitable tank for carrying out our invention.; A being the tank, which is constructed of any suitable material, such as cement-concrete. It is shallow in comparison with its other dimensions and is provided with a cover, 60, which is preferably made air-tight, and a man hole or holes, 61, are provided in such cover and also made air-tight. An opening with a check-valve, 62 (see Fig. 2), may be placed in the cover 60, of the tank, A, to permit of the egress of gases of decomposition. It is not absolutely necessary for the tank to have an air-tight cover, as above described, because the dark scum which forms serves to keep both light and air from the sewage; but we consider it important to provide the cover. The inlet, 63, to the tank discharges into same some distance below the normal water-level, and is preferably directed horizontally, or downward, as shown, so as to avoid breaking the scum which forms in the tank when sewage has been in it for two or three days.

"The outlet from the tank is submerged, preferably in the upper half of the depth of the tank, and is extended across the whole or the greater part of the width of the tank, so as to draw off the clear water below the scum or floating matter without disturbing the latter. It is necessary to discharge the contents of the tank or vessel along an exended line lest the flow should be concentrated to a point or points of discharge and so disturb and carry away the floating matter. The outlet therefore consists of a pipe or conduit, 10, which may or may not be closed at its top, following the line along which it is desired that the contents of the vessel or tank, A, should be discharged and having throughout its length or a part thereof a slot or aperture by which liquid may enter the said pipe or conduit. Such slots or apertures may diminish in size toward the outlet or outlets from the said pipe or conduit, so as to avoid an excessive rate of flow thereinto near such outlet or outlets, thus maintaining a uniform flow into such pipe or conduit throughout its length. The slots or apertures may be placed in any position along said pipe or conduit, 10, so as to admit liquid into the same in a downward, upward, horizontal, or oblique direction, as may be desired.

"If desired or found advisable, the slots or apertures may be protected by a deflecting surface or surfaces so placed as to ward off solids or liquids coming from any particular direction. The slot or apertures may also be provided with a strainer for the exclusion of solid matter. The pipe or conduit, 10, may be fixed or movable. The size of the tank will depend upon the quantity and character of the sewage to be treated. Preferably two or more tanks should be provided, so that any of them may be emptied, if necessary, without interrupting the purification of the sewage.

\* \* \* \* \* \* \* \* \* \*

"In the arrangement shown in Figs. 1, 2, and 3, the sewage or other liquid coming through the sewer, 13, is delivered into a well, 14, where grit and other solid matters are allowed to settle. It then passes through the pipes, 15 and 16, and the inlets, 63, into the tank, A, in which it may be treated either chemically, bacteriologically, or otherwise, as desired; but it is preferable to treat it bacteriologically. After treatment in the tank, A, it passes into the pipe or conduit, 10, through the slots or apertures provided for the purpose, the effect of which is that it is evenly delivered all along the line of the opening or openings into the pipe or conduit, and concentration of the flow to one or more points is avoided. From the pipe or conduit, 10, the effluent passes through pipes, 17 (which may, if desired, be provided with suitable valves), into the aërator, 18, which, as shown, is divided into a suitable number of compartments, 64. The effluent passes into the first of these compartments, and

when this is filled it passes out through an opening at the top into a slightly sloping surface, 65, down which it flows in thin films until it falls into the next compartment, 64; this operation being repeated until it arrives at the last compartment, whence it may, if desired, be conveyed through a pipe, 66, to a filter or filters for further treatment. It will be seen that as the effluent passes over the inclined surface, 65, it will be exposed to the action of the air, and so aërated. Instead of employing the form of aërator above described, an overhanging lip or lips may be provided, over which the effluent falls in a thin film or films exposed on both sides to the air."

Claim 5 has in combination (1) the "septic tank," having "an outlet" (a) "disposed above the bottom and below the normal water-level of the tank," and (b) "open across the greater part of the width thereof"; and (2) "an aërator connected with said outlet." No sewer or connection of the tank therewith is mentioned. Claim 6 adds a drain or sewer, a settling tank, which is outside the septic tank and connected therewith. Claim 7 is the same as claim 5, without the aërator, but with the addition of a conduit, forming a part of the outlet, "having a longitudinal slot open across the greater part of the width of the tank." Claim 8 has in combination the septic tank and "an outlet" described in the claim "consisting of a pipe extending across the greater part of the width of the tank and disposed above the bottom and below the normal water-level thereof; said pipe having an opening in its wall throughout its length for admitting the effluent." Claim 11 has (1) the septic tank; (2) "an inlet disposed above the bottom of the tank and below the normal water-level thereof and occupying the greater part of the width of said tank"; and (3) the outlet not having the pipe of claim 8. Claim 12 has the tank and the inlet, but its location is not given, and also the outlet with pipe. Claim 20 has (1) the septic tank; (2) means for excluding air and light; (3) a "nondisturbing inlet" for the tank disposed below the normal water-level thereof and provided with a broadened mouth; (4) a "nondisturbing outlet" for said tank disposed below the normal water-level and provided with a broadened mouth; and (5) a sewage-conduit connected with such inlet. Claim 22 is the same as claim 20, except that the "nondisturbing" inlets and outlets are not "provided with a broadened mouth."

Some of these means, in combination, if new and operative, would seem to disclose patentable invention. Such a tank as is described (tank pure and simple) in its mere construction and shape and size, whether covered or not, is not new or novel. It neither performs any new or novel function, nor permits or causes any new or novel function to be performed within it. As a closed tank, pure and simple, it holds the sewage placed therein by force of gravity or otherwise, and, being darkened and made (in the beginning of the process) air-tight, it permits and enables one of the processes of nature to go on therein. Such always has been, and such always will be, the function of such a tank. That the process described goes on therein may have been a new discovery, but the process of nature is not caused by the tank. The outlet "disposed above the bottom and below the normal water-level of the tank and open across the greater part of the width thereof" is not new. So of "an aërator" connected with the outlet. The tank is to hold or contain the pool or mass of sewage, the outlet is for the escape of the fluid after nature has done its work, and the aërator is to expose

the fluid after escape from the tank to the action of the air.   The outlet is necessarily a part of the tank if it be made operative, an aperture or apertures or opening or openings into it.

There is no new office or function performed by the tank.   It receives and holds sewage as it always has received and held sewage or other and similar matter.   It merely permits the operations or processes of nature which take place under the conditions found there to go uninterruptedly.   Being in a dark place with oxygen excluded and free from agitation, the micro-organisms, or anaërobic bacteria, are produced and multiplied by the sewage itself, and fed by the fresh sewage constantly coming in.   The opening or outlet with broadened mouth and extending as stated is not peculiar or new, nor does it perform any new office or function.   It permits the outflow of the fluids when they have so accumulated in the tank that the laws of nature force and draw them out.   But it must be so arranged as to be "non-disturbing."   This seems to be done by its location below the surface of the sewage and by the width of the discharging opening or mouth. The aërator is attached or connected therewith, but not in any new or novel manner, and it performs no new or novel function.   It operates in the old way to produce the old result by, so to speak, separating the noxious gases or effluvia from the fluid.   It permits and hastens their escape.   It forces air or carbonic-acid gas into the outflowing liquid. It has nothing whatever to do with what is going on inside the tank. Its operation is a distinct one, and the only connection it has with the one done in the tank is that it is performed on the same fluid produced in and which has come from the tank.   I cannot see anything new or novel in the combination of claim 5, unless it resides in the "septic tank."

But what is the "septic tank" of the patent?   Is it any new or novel tank?   Are not all tanks and receptacles, which permit the ingress and egress of flowing material, and the formation of a pool of such material therein, and the retention of such pool secluded from light and air and agitation until the anaërobic bacteria have sufficiently developed to convert the solids into fluids, septic tanks in the sense of the patent? It seems to me clearly so.   Hence the "septic tank" of the patent, to be different from any other water, air, and light tight tank, must have connected therewith and forming a part thereof means, or structures, openings, and connections, which permit the reception, retention, and repose of such material under the conditions named until the bacteriological action has taken place and been completed, and then permit the outflow of the resultant fluid.   I think that in the patent in suit the patentees, in the use of the words "septic tank," meant any tank or receptacle capable of being provided with inlets and outlets and of being made air-tight, and so constructed as to exclude light, and which when provided with proper inlets and outlets so as to prevent undue agitation of the contents, and when so constructed as to be air-tight and dark, would permit the bacteriological process to go on to completion, and that therefore, as applied to the tank proper, it has no special significance.   They did not refer to the completed tank, one provided with inlets and outlets and a cover, as these are described as elements separate and distinct from and not as con-

stituent parts of the "septic tank." They did not refer to a tank in which putrefaction might or necessarily would take place, but to one which when properly equipped would produce and permit this anaërobic action.

As so construed, claim 5 is invalid, as it does not disclose patentable invention. Such or similar tanks were old in the prior art. If the claim is valid, every tank having an outlet disposed above the bottom and below the normal water-level of the tank and open across the greater part of the width thereof is monopolized, if an aërator is connected to such outlet. As such tanks with such outlets were old in this art, and the aërator, also old, has nothing to do with its operation, but simply receives the fluid for the purpose of aërating it by an operation or process of its own, I do not see patentable invention in the combination. We have a mere aggregation of old devices, or old elements, each performing its old office or function in the old way.

Claims 6, 7, 8, 11, and 12 are void for the same reason. Neither of them discloses anything new or novel. The settling-tank of claim 6 is entirely outside of the main tank, is old in the art, and performs no new office or function, and has nothing whatever to do with the processes of liquefaction, aëration, or filtration.

But in claims 20 and 22 we have a different proposition. Here we have in combination (1) a septic tank, (2) means for excluding air and light, (3) a nondisturbing inlet for said tank, (4) a nondisturbing outlet for said tank, and (5) a sewage conduit connected with said inlet. Here we have an operative and useful apparatus provided with a "nondisturbing" inlet and a nondisturbing outlet, and, unless these are found in the prior art, the claims may be valid. But it is contended that they are found in the prior art. But, first, what is the "nondisturbing inlet," and what is the "nondisturbing outlet," of the patent in suit? This nondisturbance relates to the scum and its protection, and not to the nonagitation of the mass of sewage forming the pool, also to the retention of floating matter. Says the specifications:

"The inlet, 63, to the tank discharges into same some distance below the normal water-level and is preferably directed horizontally, or downward, as shown, so as to avoid breaking the scum which forms in the tank when sewage has been in it for two or three days.

"The outlet from the tank is submerged, preferably in the upper half of the depth of the tank, and is extended across the whole or the greater part of the width of the tank, so as to draw off the clear water below the scum or floating matter without disturbing the latter. It is necessary to discharge the contents of the tank or vessel along an extended line lest the flow should be concentrated to a point or points of discharge and so disturb and carry away the floating matter."

There is no reference to any nondisturbance of the mass of the pool in which the bacteriological action or process is taking place or being performed. Then follows a description of the outlet, viz.:

"The outlet therefore consists of a pipe or conduit, 10, which may or may not be closed at its top, following the line along which it is desired that the contents of the vessel or tank, A, should be discharged and having throughout its length or a part thereof a slot or aperture by which liquid may enter the said pipe or conduit. Such slots or apertures may diminish in size toward the outlet or outlets from the said pipe or conduit, so as to avoid an excessive rate of flow thereinto near such outlet or outlets, thus maintaining a uniform

flow into such pipe or conduit throughout its length. The slots or apertures may be placed in any position along said pipe or conduit, 10, so as to admit liquid into the same in a downward, upward, horizontal, or oblique direction, as may be desired."

The patent also says these slots or apertures in the pipe or conduit described may be protected to ward off solids or liquids coming from any particular direction or provided with a strainer for the exclusion of solid matter. Such devices are old in this art.

The inlet, 63, before described in connection with Figs. 1, 2, and 3, is described in claim 11, which is in suit, as "disposed above the bottom of the tank and below the water-level thereof," and as "occupying the greater part of the width of said tank." I do not find any special form of construction mentioned. This, then, is the "nondisturbing inlet." Turning to the prior art for tanks and inlets and outlets thereto, we find in the

## Prior Art

the French patent to Mouras, No. 144,904, of September 22, 1881 (to which we shall recur in discussing the process), describing his "automatic and odorless scavenger," in which he provides for: (1) "An air-tight tank, hermetically closed, of a capacity in proportion to the needs it is to satisfy. (2) A feed pipe, B, sealed to the top of the tank and destined to receive evacuations, slops and rain water." Here we have the tank of the patent and the sewer pipe connected therewith (at a different point, however) discharging the sewage into the tank. "(3) An elbow pipe, C, likewise fastened to the upper part of the tank and serving to discharge the sewage contained in the tank." Here we have the outlet of the patent in suit. However, the inlet does not "occupy the greater part of the width of such tank," nor does the outlet extend "across the greater part of the width of the tank." Neither does this outlet comprise "a pipe having a longitudinal slot therein extending the greater part of its length." Mouras continues:

"The feed pipe, B [sewer pipe] as well as the discharge pipe, C, both well sealed, are to plunge [extend] from 10 to 15 centimeters into the liquid in the tank."

Hence practically and in effect they are "disposed above the bottom of the tank and below the normal water level thereof." But, as stated, this discharge pipe or outlet does not comprise a pipe having a longitudinal slot therein extending the greater part of its length. It is the ordinary pipe. There is greater disturbance of the contents of the tank both at the point of ingress and at the outlet, consequent upon the centralization of both inflow and outflow. Mouras says his tank may be constructed in all kinds of forms and of all kinds of materials, but the "first condition to fulfill is to have it perfectly air-tight." Another condition is that:

"The receiving pipe and the discharge pipe each at its lowest end plunge into the liquid in the tank to a depth of 10 to 15 centimeters, for it is this covering of water which prevents the entrance of outer air into the tank."

Further on he mentions a further advantage of having the discharge pipe submerged, in that it will prevent the escape of floating substances. Evidently Mouras had no conception of the utility of or

necessity for nonagitation of the contents of the tank. He makes no mention of the "scum" or of any equivalent or of its preservation unbroken. However, his location of the ends of the pipes will, to an extent, prevent disturbance of the scum and of the underlying contents of the tank.

In May, 1883, one Philbrick gave to the scientific world, through the "Sanitary Engineer," a valuable article on "The Disposal of Sewage by Subsurface Irrigation in Suburban Residences." He described three connected tanks; one, the "settling basin," receiving the sewage through a pipe or inlet discharging below the surface of the sewage and discharging it when liquefied through pipes or outlets opening and receiving the outflow below the surface, "so that the overflow of the settling tank may not be from the surface or scum, nor from the bottom, but from a point about a foot below the surface." Here the outlet was through several pipes arranged horizontally. In the English patent to Lake, No. 5,391, June, 1882, "Improvements in and relating to cess-pools," we have both the supply pipe and the discharge pipe described and claimed as discharging the sewage and receiving the fluid, respectively, below the surface of the contents of the receptacle or tank. In the United States patent to F. L. Union, No. 424,838, April 1, 1890, we have a cesspool with sewer pipe discharging into the pool below the surface of the contents, and the discharge pipe taking up the fluids much lower down.

In the English patent to Thomas Walker and another, No. 2,329, September, 1864, for "Apparatus for utilizing sewage," etc., we have two tanks; one called "a trough," and the other the "settling pit or reservoir." They are separated by a wall. The "conduit" or sewer pipe extends along the entire end wall of "the trough" on the outside thereof, and is connected with it by many passages "at various distances of its length, and these passages, a', a', are below the surface of the sewage matter." The sewage passes from the said "conduit" through these passages into the first tank or "trough," where the solids are retained "and sink to the bottom thereof," but the fluid portion with the floating substances flows over the top of the wall forming the inner side of the trough (being the wall separating "the trough" from the "settling pit"), but on their way to the settling pit or reservoir the lighter and floating substances are intercepted by a screen and a grating arranged for the purpose. The flowage from this "trough" to this reservoir is along the entire width of the latter. Here we have plainly pointed out and suggested every idea of means contained in either the "nondisturbing inlet" or the "nondisturbing outlet" of the patent in suit. True, as to the mere mechanical device at the outlet of the patent in suit, there is the substitution of equivalents. But there is a change of form only, not of principle. We have a slow uniform outward and a slow uniform inward flow along the entire width of the reservoir, and both are nonagitating or nondisturbing. The flow of sewage from the sewer pipe or conduit into the first tank or "the trough" is underneath the surface of the sewage therein. The outflow from "the trough" to the "reservoir" is not, but it might be, if advisable for any purpose, and is plainly indicated in the prior art as in the Walker patent itself, for there is no difference in principal

between the flowage from the conduit or sewer pipe into the first tank, or "trough" and the flowage from the trough into the second tank or "settling pit." Here we have the avoidance of currents and centralization of flowage, and we have "the grating" and "the screen" to arrest all floating matter.

In the Wigner British patent, No. 364, 1870, page 7 thereof, we have the mixture of chemicals and sewage carried from the mixing pit to the precipitating tanks through culverts extending the entire width of such tanks and numerous openings along said culverts from such culverts into the tanks, all below the surface of the sewage in such tanks, and in which nondisturbance is essential; they being "precipitating tanks."

In the United States patent to Meyer, No. 505,166, September 19, 1893, we find inlets into the vats or tanks for the sewage, the "discharging ends" of which "are expanded laterally as shown in Fig. 1, so as to spread the sewage and check its flow as it enters the settling vats." What is this but the "nondisturbing inlet" of the patent in suit. As shown in the Meyer patent, these discharging conduits or sewer pipes are expanded the entire width of the vats. These vats have "eduction conduits" along their entire width with numerous openings thereto which converge later and lead to the filter. These "openings, c, c, from the vats into the eduction conduits, C, C, are located below the level at which the liquid sewage is designed to be maintained so as to prevent any greasy scum or light refuse which may pass the partitions, b2, from entering the filter," says the Meyer patent. In addition, there is a baffle board described to regulate the flow of sewage.

In the Scott-Moncrieff United States patent, No. 530,622, December 11, 1894, we have a nondisturbing inlet with broadened mouth; but the outlets, extending the entire width of the tank, are at the surface of the liquefied sewage.

The British patent to Gurtler, No. 7,134, 1887, shows a nondisturbing inlet and a nondisturbing outlet each disposed below the normal water-level, and each having a broadened mouth.

In the claims of complainant's patent in suit for apparatus I fail to find patentable invention in view of the prior art. There is no improvement in apparatus that would not occur to any mechanic skilled in the art. In fact the only improvement, if it be that, is in the addition to the outlet of the "pipe having a longitudinal slot therein extending the greater part of its length." This is a mere substitute device to aid in the even and nondisturbing escape of the outflowing liquid. It is a slotted pipe to take water slowly and evenly, and, even if new, shows no new conception or idea of means amounting to invention. All the claims in suit for apparatus are invalid for want of invention in view of the prior art. But, even if valid, they must be given a very narrow construction, and limited to the very devices specified, as, for instance, "a pipe having a longitudinal slot therein extending the greater part of its length."

### Prior Art in Process Claims.

We will now consider the validity of the process claims. Cameron seems to have described extended discovery as to the actual workings,

or action of micro-organisms and anaërobic bacteria. Mouras discovered the result of their action in and upon sewage about 40 years ago, some 20 years prior to his French patent. In December, 1881, an article on the subject and regarding the Mouras patent was published by M. F. Moigno in the Weekly Review of Science and Industry. This was to be followed, and was followed, by another article in the same journal written by Moigno, published to thè world in January, 1882. These articles refer to and enthusiastically describe the Mouras discovery and invention, and add discoveries and conclusions of their author, in which, after stating that he has seen and conversed with M. Mouras, among other things, he says:

"To-day, at last, all obstacles being removed, I can freely expose in all its details, the simplest finest, greatest perhaps of the inventions of modern times. * * * The automatic scavenger is in fact: (1) hermetically closed, and closed by the most inviolable of fastenings, hydraulic fastening; that is to say, its contents is shut off from all contact with the surrounding atmosphere. For that very reason (2) it is absolutely odorless and renders all infection impossible. [Note these are results but not the main purpose or necessity of making it air-tight]. (3) By a mysterious operation, and one which reveals a quite new principle, it transforms all it receives, solid and liquid excrements, in a rather short space of time, and without the addition of chemical ingredients, into a homogeneous liquid, only slightly turbid, and holding everything in suspension in the form of scarcely visible filaments, without leaving any deposit on the sides of the evacuation pipe nor at the bottom of the drain pipe. * * * (5) The liquid which escapes, while it contains all the organic and inorganic elements of the evacuations, is almost odorless. * * * Are not these results truly marvelous, which leave absolutely nothing to be desired, which, moreover, go beyond all hopes and expectations."

He also points out that there is no sludge or refuse, nothing left to take from the tank, and also the necessity of having the inlet and outlet below the surface of the sewage. In short, the "sludge problem" is solved, and the process of nature published to the world. In his article of January 21, 1882, Moigno points out certain results and advantages, and then says:

"That is already marvelous; but what is still more marvelous is the fact that these great results are very nearly effects without cause, or are produced almost from nothing, by the simple material transformation of the ordinary barbarous cesspool, without appeal to any new agent, without the invention of chemical ingredients, or even without addition of water from other sources, by the sole fact that the transformed tank lends itself to the employment, or better to the bringing into play, of a force of nature wholly unforseen and unknown till the present time, mysterious as well as marvelous in its magic effects. Who would have suspected that animal evacuations naturally contain and carry with them the principle of fermentation or of dissolution necessary and sufficient to liquefy and render them immediately of use in their return to the soil which had furnished their element, not without impoverishing itself? * * * Air-tightness, impenetrability to liquids or air, is the essential condition of the successful working of the scavenger. It becomes also, before everything, odorless. * * * Thus filled with water and hermetically closed the scavenger is ready to fulfill its functions truly marvelous and extremely effective. If a first liter of feces enters the tank, there will come out of it a liter of water which will be nothing but pure water; but after a certain time of operation, when the feces shall have entered in sufficient quantity, the liquid discharge will begin to be turbid and of a brownish color, not very dark. But, however prolonged the workings of the scavenger may be, were they to last 20 years, however great the quantity of feces that may enter its bowels, on the sole condition that there shall have been allowed to penetrate at the same time the

urine and in a certain proportion slops and rain water, there will never come out anything but the slightly turbid and colored liquid which is the only discharge from the hermetically closed tank. Why? Because there is going on in the heart of the scavenger a process of fermentation entirely unforeseen, which dissolved in a more or less brief space of time the most solid feces, and divides foreign bodies into porticules or fibers so thin that they can scarcely be seen floating in the turbid liquid, without the latter forming any deposit or at least any deposit that adheres to the sides of the vessels or pipe through which it flows."

He then goes to the reasons for this action—the causes—and says:

"(3) Theory of secret of the scavenger. Here comes up the great question: How are solid matters so unassailable by water, so insoluble in water, by the contact with water, dissolved and made liquid so surely and easily in the heart of the automatic scavenger? I do not yet know in a certain and rational way. * * * Therefore, if I am not mistaken in the heart of the scavenger, the great agent of dissolution, of liquefaction, would be hydrosulphate of ammonia or one of its congeners. Sheltered from contact with the air or oxygen, its action would determine a kind of putrid fermentation, the last period of which would be the dissolution, the liquefaction, of the solid feces. * * * May it not be discovered perhaps that the mysterious agents of fermentation, cause of the decomposition and liquefaction of the feces, are the vibrious or anaërobic bacteria which, according to Pasteur, are destroyed by oxygen, and which manifest their destructive activity only in vessels from which the air is excluded?"

He then gives certain observations and experiments, and says, among other things:

"(1) Only urine, feces and a very little water, hardly a glass a day, entered the aquarium. Nevertheless the liquefaction was complete. The excrements are so dissolved that they no longer sink to the bottom, and everything remains in suspension in the liquid. Solid feces introduced the 29th of August were completely liquefied the 16th of September, with the exception of matter not digested by the stomach, stones and skins of grapes, the stony concretions of pears, etc. Onion and carrot peelings, cabbage leaves, etc., floated on the surface some time, then sank to the bottom to await their decomposition or dissolution. Such is the case with all foreign substances that are soluble, and even with paper, which at first rises to the surface, becomes more and more saturated with water, sinks to the bottom, and disappears as if it melted away. * * * The feces always rose to the surface, mixed together, forming a kind of slimy pulp, of a thickness which never exceeded five centimeters, in consequence of the constant dissolution of the lower layers. After there had been added ten liters of water, the undigested substances, such as vegetable refuse, were seen to arrange themselves on the surface, in the order of their density, then sink to the bottom of the tank to await their decomposition, which took place insensibly. It is a deposit, not sedimentary but flaky, which little by little melts and dissolves to be soon discharged by the waters of the aquarium, which show to the glance no foreign substance in suspension."

He also points out that absence of air is absolutely essential, as follows:

"Hermetical is therefore the condition necessary, indispensable and sufficient of the dissolution of the liquefaction of the feces and of the wonderful working of the scavenger."

He has also discovered the "scum," for he says:

"The disaggregation or dilution of matter is complete after 30 days immersion in the tank, so that the feces never form on the surface of the water anything but a layer of 75 millimeters thickness, which renders their decomposition very easy."

These quotations demonstrate that it was known more than 25 years ago that sewage discharged continuously into an air-tight tank through an inlet below the surface of the mass of sewage therein, such tank being provided with an outlet opening from below the surface of such mass, would wholly dissolve into liquids—that is, become liquefied— leaving no sludge or deposits, and that the liquid would be almost entirely odorless; that a scum limited in thickness would form on the top of the mass of sewage; that this liquefying process was self-acting in the absence of oxygen; and that the probable cause of this process of liquefaction was the action of "vibrious or anaërobic bacteria which, according to Pasteur, are destroyed by oxygen and which manifest their destructive activity only in vessels from which the air is excluded." No mention is made of the exclusion of light, but the operation was carried on in a dark tank, as light was necessarily excluded from the vessels employed by Mouras.

As early as 1878, the German Empire granted to Dr. Alexander Müller, of Berlin, a patent for, "A process of disinfection, purification and utilization of putrescent waste liquid or liquid sewage, by the rational cultivation of fermenting leaven-like organisms." After pointing out and referring to prior methods and their failure or inefficiency, the patent says:

"Now, whereas the former disinfecting methods had for their essential object to obviate as far as practicable any phenomena of putrefaction (corruption or decomposition) the process herein described, on the contrary, aims at the methodical cultivation of those small 'leaven-like' organism to the viability of which modern science has traced the so-called 'self-unmixing' processes, namely, acidification, fermentation, putrefaction, decay or the like, in accordance with the rules of physiology, with a view to bringing them into requisition in the task of precipitating out the liquid waste-substances or bringing about their complete mineralization (i. e., reduction to simple inorganic compounds)."

It thus appears that the idea or conception of producing and cultivating and housing these micro-organisms was not new or original with the patentees of the patent in suit.

In the English patent to Lake, 1881, No. 5,391 ("Provisional Specifications"), this same process of the patent in suit was used, although it does not explain the "whys and wherefores" of the action on the sewage in the tank or cesspool. It states:

"But that which is so discharged from this cesspool is always liquid holding in solution a certain quantity of substances proceeding from the decomposition and disaggregation of the fecal and other matters which are at the bottom of the cesspool or receptacle."

And further:

"With this system there is no necessity for the usual removal of the solid matters. The decomposition thereof goes on constantly, and there can be no liberation of gas. All the liquid flows away with the decomposed substances held in suspension, through the discharge pipe, and through a channel connected therewith, into a pipe which leads into the sewer. This last-named pipe dips slightly below the lowest water mark in the sewer, so that the contents of the cesspool are at all times protected from the air until they are discharged into the water in the sewer."

In the British patent to Adeney and Parry, No. 3,312, applied for March 1, 1890, and granted February 14, 1891, they provide for keep-

ing "the liquor to be treated under suitable conditions for the rapid multiplication of micro-organisms." The patent states that the germs of these micro-organisms are generally in the liquid, but they may be specially bred and added to it. In several places the patent specifications provide for the breeding and rapid multiplication of these micro-organisms and describe the work they do. Some of the conditions are described.

Whether we are to cultivate aërobes or anaërobes for the purification of sewage, the conception and principle involved is precisely the same. Each colony has its work; the one in the presence of oxygen and light, the other in the absence of oxygen and light. To cultivate aërobes we have a tank open to light and air and introduce oxygen. To cultivate anaërobes we have air-tight tanks like Mouras, thereby excluding oxygen, and constructed of such material as to exclude light. For anaërobes the less agitation the better. But, after all, we provide the conditions for the development and growth of each. The conception is that if we desire their action we must have their presence, and if we would have their presence we must provide the conditions under which they generate and multiply. In November, 1892, Scott-Moncrieff, of London, England, applied for and in December, 1894, obtained United States letters patent No. 530,622, for "Treatment of sewage and apparatus therefor." He says:

"My invention relates to certain improvements in the treatment of sewage and the apparatus therefor, and has for its object to purify sewage and discharge a clear and inoffensive effluent. This I effect by the action of microbes which liquefy and break up the organic matters in the sewage. Hitherto it has been believed that the beneficent action of these organisms in the purification of effete matter could only be carried out in the presence of oxygen, and with this end in view experiments have been carried out almost exclusively in the direction of downward filtration; the object being to secure the largest amount of oxygen available by atmospheric contact during the operation. One obvious objection to this process is the necessity for preliminary straining or deposition of the coarser particles of the sewage to prevent clogging the filter. This straining or deposition, as a matter of fact, amounts to nothing more nor less than depriving the organisms of the greater proportion of their food supply, leaving a mass of filth which never enters the filter, and consequently is never broken up or nitrified, and so constitutes a nuisance in itself. I have discovered that the total solid matter in ordinary sewage can be dealt with as the actual food supply of the organisms if it is properly conveyed to them. All that is required for this purpose is to concentrate the sewage in a comparatively small space, and to have a constant movement occurring. When this is done, there is no need for the same amount of oxygen as has hitherto been believed to be necessary. It is also an essential part of the process that the enzymes of the saprophytic species which perform the work should be removed as soon as formed from that portion of the filter bed wherein it is believed that the production of micro-organisms is most active. The following, among others, are the organisms which it is the especial object of the apparatus to cultivate, namely: Bacillus fluorrescens liquefaciens, bacillus subtilis, protean forms (particularly the proteus vulgaris), bacillus figurans, etc. According to my invention, no preliminary straining of the sewage is necessary, the apparatus being so arranged that the bacteria multiply and unceasingly perform their functions; any previous removal of organic matter from ordinary sewage being detrimental to their action. My invention comprises also special means for maintaining them healthy and vigorous. I also provide means for the further purification of the effluent obtained from the cultivation filtering bed. * * * My invention includes also means for insuring the most favorable condition in the filtering material for the development of the micro-

151 F.—17

organisms contained in sewage. Suitable inlet, outlet, flushing, and cleaning appliances are provided, and my invention includes also special means of resting and aërating the filtering material without interfering with the continuity of the treatment."

He then describes his apparatus, and then says:

"This combined concentration and movement provides the conditions favorable to the development of micro-organisms which increase directly as the food supply, and continually encroach upon the same. Sludge or deposit (which merely represents that portion of the organic matter which the organisms have not had time to liquefy), and inorganic detritus, may be removed from the concentrating compartment, B, when required by simply opening the penstock, I, I, and raking out or flushing. In order to maintain the conditions most favorable to the process in low temperature, I combine with the above-described apparatus an arrangement of pipes, P, P, as shown in Figs. 4, 5, and 6, for the circulation of hot water from a boiler, P', whereby the filtering material, M, may be maintained when necessary or advisable at the temperature most favorable to the growth and action of the micro-organisms. * * * By making the concentrating conduit, B, of less capacity or contracted as compared with the filter bed of larger area above it, and further by arranging the inlet of the crude material to said conduit at the extreme bottom thereof, a result is obtained which is vital to the successful cultivation of the micro-organisms, as by this the crude material in the contracted conduit, or chamber is kept constantly on the move passing forward and upward without any place of permanent deposit, thus preventing the accumulation of stale organic and fecal matter which would destroy or retard the action of the micro-organisms."

His claim is:

"The herein-described method of purifying sewage which consists in passing the sewage, without previous removal of the solid portions, under a suitable head, first through a concentrating chamber with contracted outlet openings in which the solid portions are retained until so far decomposed by the action of the micro-organisms that they can pass through the outlet openings, while the life products of the micro-organisms are allowed to pass out with the liquid and finer solid particles without delay, and then upward through a filter bed of suitable depth and of greater superficial area than said concentrating chamber, whereby the decomposition of the solid matters is substantially completed, substantially as described."

He carries his sewage to the bottom and lower compartment of the tank by means of a pipe and a horizontal chamber located at one end of such tank, and there discharges it. Here the solid matters are not disturbed, and they remain until liquefied by the action of the micro-organisms which are here developed in such sewage. Means are provided for discharging any part not so liquefied or which the micro-organisms do not have time to liquefy. This is also done by the defendants, as it is found the Saratoga sewage plant does not wholly do away with sludge. This chamber or compartment at the bottom of the tank is necessarily air-tight and dark, essential conditions for the development and growth and action of the micro-organisms, whether Moncrieff actually knew the fact or not. This lower compartment, smaller than the one above it, is only separated from it by a numerously perforated diaphragm covered with filtrating substances, and as fast as the sewage in the lower compartment becomes liquefied by the action of these micro-organisms, or anaërobes, it rises through these numerous perforations and the filtrating materials into the upper part or compartment of the tank, and is thence discharged through numerous outlets located all along the side of the tank. The

inventor has, therefore: (1) A nondisturbing inlet for the sewage, opening and disposed below the normal water line of the sewage in the tank; (2) an air-tight and darkened tank in which the micro-organisms are developed and do their work of liquefying the sewage; (3) a filter bed through which the liquefied sewage must and does pass on its way to the outlet extending substantially the whole length of the tank; and (4) a nondisturbing outlet. And it is all done in a flowing current of sewage, as much so as in the patent in suit. He not only liquefies the sewage by the same process of the patent in suit, but, by direct connection, and before it passes from the tank, he filters it. He does not aërate the liquid. He does not protect the sewage from light and air while the micro-organisms are doing their work according to nature's process by the "scum," but he does this by the filter bed and filtered liquefied sewage always standing above it. The result sought and obtained is the same as in the patent in suit.

The workshop provided for the bacteria while doing the work of liquefying the sewage is somewhat different. The process, so far as developing bacteria and liquefying the sewage is concerned, is precisely that of the patent in suit, viz., the liquefaction of the raw sewage secluded in a tank or receptacle excluding light and air and free from all disturbance, except such as is incidental to the inflow and outflow of sewage, by the natural action of micro-organisms developed and grown in the mass of sewage at the bottom of the tank. Scott-Moncrieff may not have known just why and how this action took place, but he knew it did take place, and he knew the result, and he provided conditions and means, the essential conditions and means, for producing the result sought. He is presumed to have known of the Mouras discovery that an air-tight tank was essential to the workings of these micro-organisms. He and Mouras, not Cameron, exploded the theory that the presence of oxygen was necessary and asserts the contrary. It is quite true we find that many contended for the presence of oxygen; but, nevertheless, the discovery had been made and published to the world that absence of oxygen was the one essential condition for the effectual development and working of these anaërobic bacteria, micro-organisms. It is immaterial that dozens or even hundreds of scientific men failed or refused to believe. It is also disclosed by the evidence that the so-called septic tank, in all essentials, was in use in Urbana, Ill. in 1894, and designed for Champaign, Ill., in 1895, and constructed in 1897. I will not take time to go into details or a description of these works.

Cameron's (the patent in suit) conception was to provide an "artificial method" for "the liquefaction and purification of sewage" by the action of anaërobic bacteria developed in a pool of the sewage under proper conditions. But this, as we have seen, had been done before, even if we may say that nature's method and means of doing a thing become an "artificial method" of doing the same thing when we provide a new place, an artificial place, or a place, like a tank, constructed by human hands, in which nature by its own instrumentalities is to perform its own process. The patentee declares:

"The invention consists in certain methods of developing in a flowing current of sewage bacteria capable of dissolving the mass of solid organic matter con-

tained therein," and (2) "of subsequently utilizing the so-developed bacteria in liquefying the mass of organic matter contained in the flowing current."

If this means what it says, nothing of the kind is done. The bacteria or micro-organisms are not developed in the "flowing current of sewage," and cannot be effectually. They are developed in that part of the sewage which is at rest, and which has been brought to a "standstill" secluded in a pool, and which must remain at a "standstill" below the flowing current until the bacteria are developed and have actually liquefied it. Nonagitation, nondisturbance, nonflowage are essential to the effectual development and action of the bacteria. The liquids of the sewage that do not require liquefaction flow along through the tank and pass out, but this part does not develop bacteria of the character mentioned. Hence the necessity for the deep tank in which the more solid parts of the sewage may remain at rest in a pool, deposited at the bottom, outside the "flowing current of sewage," for days, while the bacteria develop and work and liquefy this nonmoving mass. When liquefied it returns to the flowing current of sewage, becomes a part of it, and passes on. And the bacteria after development do not liquefy "the mass of organic matter contained in the flowing current," but that part of the organic matter which has left the "flowing current," sunk to the bottom of the pool, and remained at rest for the development and action of the bacteria. But, in any event, it is the same "flowing current" of the prior art, as in Mouras, where the sewage entered at the inlet, was, except the fluid, deposited at the bottom of the tank for the development and action of the micro-organisms, or bacteria, and then, when liquified by the operation of natural laws or processes, liberated and carried along in the flowing current of fluids, and as in Moncrieff and Adeney fully described. Philbrick, Waring, Champaign, and Urbana had the same flowing current and by-pool.

All this was indicated and pointed out to him in the prior art, with which he is presumed to have been familiar. The conception was not new or novel. I fail to discover any new or novel method of developing bacteria, or of allowing or permitting or enabling them after development to do their work of liquefying the sewage. They develop, as they always had done, and always will do, under certain conditions, and when developed they liquefy certain materials, as they always had done, and as they always will do if not prevented. Pasteur discovered the difference between, and gave the names "aerobic" and anaërobic" to, certain bacteria or micro-organisms to distinguish those which develop and exist in the presence of free oxygen from those which do not. Mouras and Moigno and many others knew that an air-tight receptacle did not contain free oxygen, and that therefore aërobes did not liquefy the sewage contained in such an air-tight receptacle or tank. As already stated, Mouras and Moigno had discovered and published to the world the fact that sludge would not form in such a sewage receptacle or tank having a submerged inlet and outlet. Cameron did not, as shown, even discover "the scum." His tank must be air-tight in the beginning of nature's process going on therein, but, when "the scum" is once formed, it may be opened. Therefore his

discovery of the utility of "the scum" is not patentable invention. He has dispensed with nothing. He has added nothing. He has, we will assume, found in nature's process an aid, not to his process, but to nature's process, a part of it, and Cameron utilizes it at a later stage, in that he may leave his air-tight tank open after the bacteria have been developed and have constructed their own roofing. This discovery, if it be Cameron's, has not enabled him to even modify the tanks of the prior art. Clearly the formation of this scum or its use is not a part of any patentable process.

A principle is not patentable. Le Roy et al. v. Tatham, 14 How. (U. S.) 156, 14 L. Ed. 367; O'Reilly v. Morse, 15 How. (U. S.) 62, 14 L. Ed. 601; Corning v. Burden, 15 How. (U. S.) 252, 267, 14 L. Ed. 683. See Risdon L. W. v. Medart, 158 U. S. 68, 77, 78, 15 Sup. Ct. 745, 39 L. Ed. 899; Boyd v. Cherry (C. C.) 50 Fed. 279.

It is when the term "process" is used to represent the means or method of producing a result that it is patentable, and it will include all methods or means (not nature's) which are not effected by mechanism or mechanical combinations. Corning v. Burden, 15 How. (U. S.) 252, 267, 14 L. Ed. 683, approved Risdon L. W. v. Medart, 158 U. S. 77, 15 Sup. Ct. 745, 39 L. Ed. 899. We may have a valid patent for the means or methods of putting principles into operation so as to produce useful results, but not for nature's means and methods. Those are common property, and cannot be appropriated and monopolized by any one.

It was discovered years ago, before Cameron came into the field, that sewage, in an air-tight tank, or receptacle of any kind, having an inlet and an outlet, both submerged therein or opening in the tank below the level of the contents, would generate or develop active bacteria, or micro-organisms, which, feeding on such sewage and on the newly arriving sewage, would so act upon it as to liquefy it permanently, leaving no great amount of residue or sludge. It is true that the principle was not fully comprehended and understood, but enough was known and understood to enable the prior art to construct and use their "septic tanks" with a flowing current of sewage secluding in the tank under the proper conditions a pool for the development and action of the bacteria. This result was obtained in the prior art by the process of the patent in suit. This development of bacteria is a fundamental truth in nature. In patent law it is a principle. It is a process of nature, but a principle, and not patentable. But, if patentable, Cameron was anticipated. Now, take the means for bringing this principle into operation, for making it serviceable to man, the process of liquefying sewage by anaërobic action. We have, with Cameron, the air-tight tank or receptacle with the inlet and outlet demanded. The raw sewage flows in and remains at rest, while the liquids coming in and those produced by the anaërobic action flow out. Nothing whatever is done to the sewage after its arrival. It must be left undisturbed. In fact it must not undergo any process whatever except the natural one; that is, let nature take its course. It is like a process for fermenting cider or improving whisky. Run it into the

barrel or tank where it will not freeze, and let it alone. · But all this had been done before. Assume that Cameron discovered that these anaërobes would in an air-tight and dark receptacle construct a covering for themselves by the formation of the scum. His process has nothing to do with that. It is a principle, and not patentable. But he did not discover it, as we have seen. Moigno twice describes it.

But, it is said he has improved the means, and therefore has an improved process. But we have seen that his process is old, his means old, except, possibly, in some mechanical details. In the sewer pipes, entirely outside of and away from the tank, he has put in the old settling tank or catch-basin of the prior art for stone, iron, bones, etc. Outside the tank at the other end he has attached an aërator or more properly aërating means which deals with the liquid after it has left the tank, and then he adds to that the filter—all old devices. Each performs its old function in the old way, and each acts independently of all the others and is independent of the tank and the process going on there. This is mere aggregation, and not patentable. Atlantic Works v. Brady, 107 U. S. 192, 199, 200, 2 Sup. Ct. 225, 27 L. Ed. 438; Pickering v. McCullough, 104 U. S. 310, 26 L. Ed. 749; Dodge Cold Storage Co. v. N. Y. C. & H. R. R. Co. (C. C.) 139 Fed. 976, affirmed by the Circuit Court of Appeals January, 1907, 150 Fed. 738.

The process described in claims 1, 2, 3, and 4 is nothing more nor less than the process of Mouras and of Moncrieff and the ones in use at Champaign and Urbana. It should be mentioned that Mouras took out a patent in the United States in 1882 for his process, No. 268,120, and that he had a device in the tank itself for intercepting bone and other hard substances. The same is true of claim 21, for it cannot be doubted that the scum existed in all those cases, and did its work, although its office or function in nature's process may not have been understood. The process described had become public property in the United States before the patent in suit was applied for. To hold these claims valid would make an infringer of every one who shall use the Mouras tank with its inlets and outlets. Certainly so, should such user apply to it the broadened inlets and outlets of the prior art; that is, the devices of the prior art used in sewage disposal, etc., prior to the Cameron patent. I cannot discover any new "conception" in the patentable sense in the patent in suit. I do not doubt it improves some of the mechanical devices at the outlet. I do not doubt that it was a "good thing" to connect the aërator to the "septic tank," and then connect that to the filter, but I do not find patentable invention in so doing.

Coming to the defendant's sewage disposal plant, we find: (1) a large oblong tank constructed of solid masonry made air-tight by a roof covered with earth and supported by arches and pillars. It is also provided with manholes which may be left open. The sewage is brought to this tank or receptacle in a pipe or conduit extending all along one end, or nearly so, and enters through a main or mains into a pipe located on the inside of the tank which extends, in length, nearly the width of the tank and is properly supported, by a concrete bracket reinforced by railroad iron, some 3½ feet below the water-level. This discharges the sewage into the tank proper at four points (as shown in

blue print drawing). In every essential it is the means of ingress or inlet of the Walker 1864 patent. It is an improvement on that, doubtless, but it is far from the inlet of the patent in suit. As to the outlet the description in the engineering record says:

"The septic effluent is discharged at the opposite end [of the tank] through ninety-six 2-inch pipes, in two horizontal rows, also 3½ feet below the highwater line, in a narrow chamber extending the width of the tank. From this chamber it flows over a weir into an outer chamber, and thence through an aërator to an adjacent dosing tank."

These 96 pipes are simply holes in the wall in which the pipes are inserted. There is no slotted pipe or pipes on the interior. Nor is there one on the exterior to aid in the outflow from the tank itself. The "narrow chamber" is outside the tank, and is under cover as is the outer chamber. There is no current to any central point, and hence no disturbance or breaking up of the scum. There is no aëration on leaving the tank. From the outer chamber the effluent is carried by a large pipe some considerable distance to the aërator located at about the center of the filtration beds, 20 in number, covering an area of some 20 acres. Here "the liquid rises through the central pipe," and then is discharged and flows over the "sheet-iron plates of the aërator hung in three layers around a central riser pipe." Thence it is carried to the filter beds. We do not have either the inlet or the outlet of the patent in suit, nor its aërator. Much more nearly do we have the outlets of the Wigner and Meyer patents, found in the prior art before Cameron came into the field. We do not have the same combination of elements, taken as a whole, found in any one of the "apparatus" claims of the patent. If they, or any one of them, have any validity whatever in view of the prior art, they must be very narrowly construed and limited to the inlet and outlet and other devices shown therein. As so construed and limited, defendants' sewage plant does not infringe any apparatus claim. Complainant cannot claim the "septic tank" broadly, for it is in the prior art. He cannot claim the inlet described broadly, for that too is in the prior art. Even if he may claim his specific outlet broadly defendant does not infringe, for he does not use it.

As to the process claims, claim 1 is plainly invalid, anticipated, and long in use prior to the Cameron patent. As to the other process claims, while in my opinion invalid as not disclosing patentable invention in view of the prior art, and because of prior public use, etc., still, if either has any validity, in view of the prior art, it must be narrowly construed and limited to the exact process performed by the means described in the Cameron patent, and as so construed and limited defendant does not infringe. The Cameron process, if it be a process, consists in constructing a tank in a certain way in which to enable a process of nature to be performed, and as he has borrowed the tank, the inlet, and, in the main, the outlet from the prior art, changing or improving no element, except it be the outlet apparatus, and produces no new result, the defendant does not infringe in using the old tank and inlet with an outlet entirely different from Cameron to produce the same result. In fact the inlet, and outlet, and aërator, and filter, all are essentially different from Cameron.

But I prefer to base my decision on the broad ground that the claims in suit of the Cameron patent, in view of the prior art, are invalid for want of patentable invention. Cameron may have carried forward discovery in this art, and may have improved means; but, as defendants' process and apparatus are clearly differentiated, there is no infringement. Cimiotti Unhairing Co. v. American Fur Refining Co., 198 U. S. 399, 414, 25 Sup. Ct. 697, 49 L. Ed. 1100; Kokomo Fence Machine Co. v. Kitselman, 189 U. S. 8, 23 Sup. Ct. 521, 47 L. Ed. 689. Not every improvement in an article or process is invention. The improvement must be the product of original conception. Pearce v. Mulford, 102 U. S. 112, 118, 26 L. Ed. 93. Slawson v. Grand St. R., 107 U. S. 649, 2 Sup. Ct. 663, 27 L. Ed. 576; Munson v. N. Y. City, 124 U. S. 606, 8 Sup. Ct. 622, 31 L. Ed. 586.

There will be a decree for defendants dismissing the bill, with costs.